Opinion delivered December 14, 1887.

24 495
28 215
28 430
29 230
29 367
24 495
30 686

No. 2754

## W. R. ORMAN *v.* THE STATE.

1. MURDER—SELF DEFENSE—CHARGE OF THE COURT—CASES APPROVED.—
   In regulating the right to take life in necessary self defense, the code of this State establishes an essential distinction, based upon the nature

and severity of the unlawful attack, and discriminates it into two classes. The first class, regulated by article 570 of the Penal Code, comprises all cases in which, from the acts of the assailant or his words coupled therewith, it is reasonably apparent that his intent is to murder or do serious. bodily harm, in which case the assaulted party may lawfully slay his aggressor while he is committing the offense, or when he has done some act evidently showing his intention to commit it. The second class, regulated by article 572 of the Penal Code, comprises those cases in which the purpose or intent reasonably indicated by the unlawful and violent attack is other than those above mentioned. The proof on this, as on the former trial of this case, shows that, if the deceased made any attack on the accused, it was a murderous attack which came clearly within the provisions of article 570 of the Penal Code, and there was no evidence whatever tending to show a milder attack. In this state of the proof, the trial court erred in charging the provisions of article 572, because such charge, being unauthorized by the proof, was calculated to confuse and mislead the jury. Note the opinion for the approval on the subject of Orman's case, 22 Texas Court of Appeals, 604, and Kendall's case, 8 Texas Court of Appeals, 569.

2. SAME—MANSLAUGHTER—"ADEQUATE CAUSE."—Any condition or circumstance which is capable of creating sudden passion, rendering the mind incapable of cool reflection, may be "adequate cause," and where the evidence shows a number of conditions or circumstances tending either singly or collectively to show "adequate cause," the jury should not be restricted by the charge to a consideration of a single condition or circumstance, but should be directed to consider them all in determining the question of "adequate cause." The proof in this case shows (besides insulting language used by the deceased about the mother and sister of the defendant) that the deceased, for several hours preceding the killing, was searching for the defendant with the avowed intention of killing him on sight, and that he was armed with a pistol with which he declared his intention to kill the defendant. Held: That, in confining the "adequate cause" to the insulting language, and in failing to submit to the jury whether the said acts and threats of the deceased (which were proved to have been communicated to the defendant), of themselves, or in connection with the insulting language, were not "adequate cause," the charge of the court on the issue of manslaughter was erroneous.

3. SAME—"COOLING TIME."—See the statement of the case for a charge of the court on the principle of "cooling time," held, erroneous because not authorized by the proof.

4. SAME—EVIDENCE—PRIVILEGED COMMUNICATIONS.—See the statement of the case in Orman v. The State, 22 Texas Court of Appeals, 604, for the evidence of an attorney at law, held not to partake of the nature of a "privileged communication," and to have been properly admitted.

5. JURY LAW—NEW TRIAL—PRIVILEGE OF COUNSEL.—The proof in support of the motion for new trial, based upon the misconduct of a juror, failing to show any prejudice to the rights of the accused, the trial court did not abuse its discretion by refusing the new trial. Note the animadversion of this court upon the reprehensible conduct of a press reporter

in eavesdropping the jury while considering their verdict. Note also this court's disapproval of the language used by the prosecuting counsel in the closing argument for the State.

APPEAL from the District Court of McLennan. Tried below before the Hon. John N. Henderson, on exchange.

This is the appellant's second appeal from convictions in the second degree for the murder of W. F. Hughston, in McLennan county, Texas, on the seventh day of September, 1885. The penalty assessed in the present conviction was a term of five years in the penitentiary. The conviction in this case was had upon substantially the same evidence that was adduced upon the former trial, which will be found fully reported in the twenty-second volume of these Reports, beginning on page 604. As important, however, to elucidate the ruling of this court upon the action of the trial court in overruling the motion for new trial, it is deemed proper to set out, in this report, the affidavit of M. B. Davis, filed, and the testimony of the said Davis adduced to controvert the defendant's affidavit in support of the said motion. Among the grounds alleged for new trial, the motion sets up the following:

"Second. Defendant submits that he has not had a fair and impartial trial, for the following reason, to wit: The charge of the court was given to the jury, and they retired to consider of their verdict about half past twelve o'clock p. m., on Friday, the eighteenth day of November, and their verdict was returned into open court at about eleven o'clock on Saturday morning, the nineteenth day of November. On Friday, November 18, a 'special dispatch,' dated Waco, Texas, November 18, was sent to the Dallas Morning News, and published in the daily of November 19, some six or seven hours before the verdict of the jury was returned on said November 19, as aforesaid; wherein, among other things, occurs the following: 'The jury in the case of The State of Texas v. W. R. Orman, charged with the killing of W. F. Hughston, after fourteen hours, brought in a verdict of guilty, assessing punishment at confinement in the penitentiary for five years. At the March term, in 1886, Orman got fourteen years. This was reversed and remanded, and this is his second trial.' Defendant submits to the court that this shows communication between the jury in his case, or some of them, and outsiders, contrary to law, public policy and the rights of defendant."

32

The counter affidavit of M. B. Davis reads as follows: "I, M. B. Davis, do solemnly swear that I am the correspondent of the Dallas News in Waco, and I am the person who sent to the said News the item referred to in the motion for new trial of defendant W. R. Orman, which was published in said News before the verdict was rendered in open court; and I do solemnly swear that I did not communicate with any member of the jury in reference to the case on trial or anything else, and that I did not get the information sent by me to the News from anyone else who had communicated with the jury. I formed my opinion of what the verdict of the jury would be from words I heard spoken through the walls of the jury room while I was standing on the steps leading down from the district court room to the lower story of the court house, and from a general discussion I could hear from the outside going on in the jury room. When I sent the dispatch I did not, as a matter of fact, know what the verdict of the jury would be, and when it was rendered it happened to be just what I had stated it to be in the dispatch. In other words, I made a good guess at the verdict, based upon the facts acquired by me as stated above. I will further state that the copy of the News in which said dispatch was published did not reach Waco until after the verdict was rendered by the jury, and consequently could not have been seen by any member of the jury during their deliberations on the case."

The substance of the testimony of the said M. B. Davis, adduced upon the hearing of the motion for new trial, was that he sent the dispatch recited in the motion to the Dallas News and the Galveston News, at about eleven o'clock on the night before the verdict was actually returned into court. He obtained the facts upon which he based the said dispatch in this wise: He took his seat on the steps leading from the second to the first floor of the court house, at a point near the wall of the jury room, in which the jury were then deliberating on the case. Part of the time he sat there he had his head against the wall of the said jury room, and part of the time he held his ear to the key hole of the jury room door. While thus situated he heard the jurors confusedly discussing the case, using the terms "manslaughter," "ninety-nine years," "ten years," and "five years." From the fact that a larger number of the voices appeared to favor five years, the witness reached the conclusion, as a mere conjecture, that the penalty of five years would be assessed against the defendant, and accordingly sent the dispatch set out

in the motion.   He had no communication with any member of the said jury.   The issue of the Dallas News containing the said dispatch did not reach Waco until two hours after the verdict was actually rendered in open court, and the jury was discharged.

The charge of the court on the subject of "cooling time," referred to in the third head note of this report, reads as follows: "'As to 'cooling time,' the court charges you that it is time for passion to subside and reason to interpose after provocation. What is 'cooling time' is a question for the jury under the facts and circumstances of each particular case."

The language used in the closing argument for the State, referred to in the last head note of this report, was as follows:

"The defendant, Bud Orman, armed himself and hunted the deceased, Bud Hughston, and shot him like a dog, and then gave up his pistol and surrendered to an officer, and said, 'Herring advised me to kill him, and Herring said he would clear me.' Yes, gentlemen of the jury, I have seen several men that Herring defended and said he would clear hung as high as Haman."

*George Clark* and *Herring & Kelley*, for the appellant: 1. The court erred in requiring M. D. Herring, counsel for appellant, while engaged in the trial, to detail, as a witness, the private professional conversation between himself and appellant before the killing.

Upon this trial, when the State proposed to prove by the witness the confidential and professional interview between himself, as counsel, and defendant, the jury were withdrawn, and the court, after hearing the evidence, decided that it should go to the jury.   This examination by the court showed that Herring could not, in any manner whatever, be connected with the killing as even quasi particeps criminis (but on the contrary as advising against it.)   The evidence ought to have been excluded, as it is only upon the particeps criminis theory that the evidence was admissible.   Upon the former trial, it was developed while the witness was giving his evidence to the jury, that he had a conversation with appellant about the killing before it occurred, and hence the court (not being called upon to have the jury withdrawn) could not do otherwise than let all the evidence be heard.

Herring's evidence was very damaging to appellant, as it was used by the State to show deliberation on the part of appellant.

Appellant sought a private interview with Herring in his office, told him the remarks deceased had made about appellant's mother and sister (saying they were whores and had made all the money he had by cohabiting with negroes) and asked Herring what would be the consequences if he killed deceased. Herring read him the statute in case of killing for insulting words used concerning female relatives, and advised him to have no trouble with Hughston.

2.   The court erred in refusing to grant a new trial, when it was discovered after the trial that the juror McCrary was not a fair and impartial juror, but was prejudiced against appellant.

The trial commenced on Wedneseay, and it was shown by evidence upon the motion for a new trial that, on Monday before the trial commenced, McCrary was a regular juror for that week, and while on his way to the court house he fell in conversation with Clinton and Harris, and was asked what he thought of the Orman trial, which was coming up during the week, and he replied that he did not believe in a man being shot down like a damned dog without giving him any showing for his life, and that if he was on the jury he would hang Orman.   Whereupon one of the party, Clinton, said to him that he need not go to the court house, if he entertained such expressed views; that they would not take him as a juror in the case; and he said: "Well, if they take me, by God I will hang him."

The juror himself confessed to having made the statements, but claimed to be unbiased, and thought himself to be a fair juror.

Counsel asked him: "Mr. McCrary, it is true, is it not, from the general talk in the community about the Orman case, and from what you had read of the evidence in the newspapers, that you had formed a conviction in your mind that Orman had waylaid Hughston and shot him without giving him a showing, and did you not so think at the time you were sworn in as a juror in this case?" and he said:   "Yes, I thought it was a pretty bold thing for a man to do."

The juror furthermore admitted that he remembered of counsel for appellant having asked questions of the jury while it was being impaneled, but said he did not remember of being asked if he had expressed an opinion as to appellant's guilt.

This juror was shown to be an honest, reliable, truthful man, and of strong, earnest and steadfast convictions and stubborn in his notions and tenacious in his opinions, and, while he was

shown to be a jocular man, he did not so impress Clinton and Harris, to whom he was talking when he made the statement that he would hang Orman if he was taken on the jury.    He appeared to them to be in earnest, and to mean what he said.

We submit to the court that the conviction, on account of McCrary's disqualification, ought not to be allowed to stand, even if no other error had been committed upon the trial.    The statements of the juror were not known to appellant or his counsel until after the trial.    (Hanks v. The State, 21 Texas, 526; Henrie v. The State, 41 Texas, 579; Sewell v. The State, 15 Texas Ct. App., 623; Cody's case, 3 How., 27; 2 Ga., 480; Whart. Am. C. L., 1022; 7 Cowan, 128; 13 S. & M., 189; 19 Ohio, 198; 1 Lee, Va., 598; 9 Dana, 203.)

3.    The court erred in charging the jury that before appellant would be justified in killing deceased in defense of an attack being made on him by deceased, which produced in appellant's mind a reasonable expectation or fear of death or serious bodily injury, that appellant must have resorted to all other means to prevent the injury before the killing, except retreating; and that appellant could not claim the protection of the right of self defense unless he brought himself within this restriction.    This idea is set forth twice in the charge.

Such is not the law of this case.    The charge was excepted to by appellant at the trial, and a counter charge requested to the effect that appellant was not required to resort to all other means to prevent the injury before killing, except to retreat, if he was attacked by deceased in such a way as to produce in his mind a reasonable expectation of death, etc. (Hunnicutt v. The State, 20 Texas Ct. App., 643.)

4.    The court erred in charging the jury that "homicide is justifiable in the protection of the person against any other unlawful and violent attack besides an attack with murderous intent, but in such place the killing must take place while the person killed is in the very act of making the unlawful attack, and in such case all other means must be resorted to for the prevention of the injury before the party would be justified in killing, except retreating.    Appellant excepted to this charge."

On the former appeal of this case this court held that the reverse of the above instructions as to resorting to other means ought to have been given in charge to the jury.    (22 Texas Ct. App., 621.)

5.    The court erred in charging that before the killing could

be reduced to the grade of manslaughter (where the killing results from insults to female relations, etc.)   *   *   *   *   * the jury must believe that appellant was laboring under a degree of anger, rage, resentment or terror such as would commonly in a person of ordinary temper render the mind incapable of cool reflection.

Appellant was entitled under the statute to the benefit of a charge reducing the killing to manslaughter, if the jury believed the killing occurred at the first meeting after the insulting words had been communicated to appellant, and the jury ought not to bave been restricted to a belief that he must have been incapable of cool reflection in order to reduce the offense to manslaughter. If the killing was by reason of passion produced by the insult, the offense would be reduced to manslaughter, and appellant was entitled to have the law thus given to the jury unencumbered with a cool reflection clause. (Penal Code, art. 598.)

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE. This cause was before us, upon a former appeal, upon substantially the same facts and charge of the trial court, and the judgment of conviction was reversed and the cause remanded for another trial, because of an error in the charge upon the issue of self defense. (Orman v. The State, 22 Texas Ct. App., 604.) We held, on the former appeal, that it was error to charge with respect to the character of self-defense defined in article 572 of the Penal Code, because the facts of the case did not demand and warrant such a charge, for the reason that, if deceased made an attack upon the person of the defendant, it was a murderous attack coming clearly within the provisions of article 570 of the Penal Code, and hence that article alone was applicable to the evidence.

Upon the issue of self defense, the evidence in the record now before us is in no material particular different from that which was before us on the first appeal, and yet the learned trial judge gave in charge to the jury the substance of article 572, which portion of his charge was promptly excepted to by the defendant. We still entertain the opinion that such charge was inapplicable to the facts of this case, calculated to confuse and mislead the jury, and injuriously to affect the defendant's rights. As made by the evidence, the issue of self defense was governed by the provisions of article 570 alone, and article 572 should not have

been given in charge. (Kendall v. The State, 8 Texas Ct. App., 569.) In the case just cited, it is said: "If the attack of the person slain was manifestly with the intent to murder or maim—that is, made with weapons or other means calculated to produce either of those results—then there is no occasion to instruct a jury as to the law which obtains in case the attack was of a milder character, because such law is not applicable to the case, and can subserve no purpose other than to confuse the jury." It is manifest, from the evidence in this case, that if the deceased, at the time he was shot by the defendant, was making any attack upon the defendant, it was an attack with a deadly weapon, and made with the intent to kill the defendant or inflict upon him serious bodily harm. There is no evidence even tending to show an attack of a milder character.

As a part of the law of self defense, the charge of the court with reference to threats made by deceased against the defendant is complained of by defendant, and upon this subject a special instruction was requested by counsel for the defendant, and was refused by the court. After a careful examination of this portion of the court's charge, we are of the opinion that it is full, fair and correct, applicable and pertinent to the evidence, not only embodying the law as expressed in the refused special instruction, but more favorably to the defendant than in said special instruction.

Serious objections are urged by counsel for the defendant to the court's charge upon the issue of manslaughter. Except in two particulars, we are of the opinion that the charge upon manslaughter is not materially erroneous. It restricts the "adequate cause" to the insulting language used by deceased about the mother and sister of the defendant. This, we think, was error. It was in evidence that the deceased, for several hours immediately preceeding the killing, was searching for the defendant with the avowed purpose of killing him on sight, and was armed with a pistol, with which he stated he intended to kill the defendant. Defendant had been informed of the threats and conduct of the deceased just prior to the killing. It should have been submitted to the jury whether these facts alone did not constitute "adequate cause," or, if not, whether in connection with the insulting language used by deceased about defendant's mother and sister, there was not "adequate cause." Any condition or circumstance which is capable of creating sudden passion, rendering the mind incapable of cool reflection, may be

"adequate cause," and where the evidence shows a number of conditions or circumstances tending either singly or collectively to show "adequate cause," the jury should not be restricted by the charge to a consideration of a single condition or circumstance, but should be directed to consider them all in determining the question of "adequate cause." (Williams v. The State, 15 Texas Ct. App., 617; Neyland v. The State, 13 Texas Ct. App., 536; Miles v. The State, 18 Texas Ct. App., 156; Howard v. The State, 23 Texas Ct. App., 265.)

The other error in the charge on manslaughter is that portion of said charge which instructs the jury as to cooling time. That portion of the charge was, we think, inapplicable to the facts, and not the law of the case. In other respects, we are not prepared to say that the charge upon manslaughter, or upon any other issue in the case, is erroneous. But, for the errors we have mentioned, the conviction must be set aside.

With respect to the testimony of the witness Herring, we held on the former appeal that it was not privileged and was properly admitted, and we adhere to that view.

We do not think the court abused its discretion in refusing to grant defendant's motion for a new trial upon the grounds of the disqualification of the juror McCrary, and the alleged misconduct of the jury. It satisfactorily appears that the defendant was not injured in his rights by reason of said juror having passed upon the case, and that Davis, the newspaper reporter, did not, by any misconduct of the jury, obtain information about the verdict, but that he obtained all the information he had in regard to the verdict by the low and disreputable method of eavesdropping, and reported the verdict to the newspaper he represented, without knowing whether his report was true or false. This indefensible conduct of the reporter Davis was a flagrant contempt of the court, and a most reprehensible invasion of the precincts of justice, which should have been, if it was not, promptly and severely punished by the trial court.

The remarks of counsel for the prosecution in his closing address to the jury, and which are presented in the record by a bill of exception, were certainly unwarranted by any evidence in the case, and were discourteous to opposing counsel. The learned trial judge properly and promptly reprehended the counsel for making the remarks, and instructed the jury to disregard them. We will express no opinion as to what would be our disposition

of this case were these improper remarks the only error disclosed by the record.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered December 16, 1887.